THE LEGAL AID SOCIETY, Plaintiff,

v.

The CITY OF NEW YORK, The Office of the Criminal Justice Coordinator of the City of New York, Rudolph W. Giuliani, as Mayor of the City of New York, Katherine N. Lapp, as the Criminal Justice Coordinator of the City of New York, Steven M. Fishner, as the current Criminal Justice Coordinator of the City of New York, Queens Law Associates, P.C., Brooklyn Defender Services, New York County Defender Services, Inc., Bronx Defenders, Battiste, Aronowsky & Suchow, Appellate Advocates, Center for Appellate Litigation, Defendants.

Association of Legal Aid Attorneys, Local 2325, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, AFL—CIO/CLC, 1199 National Health and Human Services Employees Union, AFL—CIO/CLC, Plaintiffs,

v.

City of New York, Rudolph Giuliani, as Mayor of the City of New York, Katherine N. Lapp, as Criminal Justice Coordinator of the City of New York, Defendants.

Nos. 96 Civ. 5141(SHS),
96 Civ. 8137(SHS).

United States District Court,
S.D. New York.

Sept. 18, 2000.

D. Stuart Meiklejohn, New York, NY, for Plaintiff.

Lewis Steven Finkelman, Corporation Counsel of the City, New York, NY, for Defendants City of New York, Office of Criminal Justice of New York, Rudolph W. Giuliani, Katherine N. Lapp.

Lynn W. Fahey, Queens Law Associates, P.C., New York, NY, for Defendants Queens Law Associates, P.C., Brooklyn Defender Services, Appellate Advocates.

Robert S. Dean, New York, NY, for Defendants New York County Defender Services, Inc., Bronx Defenders, Battiste, Aronowsky & Suchow, Center for Appellate Litigation.

## OPINION

STEIN, District Judge.

## TABLE OF CONTENTS

INTRODUCTION .................................................. 210

BACKGROUND .................................................. 211

DISCUSSION .................................................. 212

 I. Applicable standard............................................... 212
 A. Judgment on the pleadings ......................................... 212
 B. Summary judgment ......................................... 213
 II. Standing ......................................... 213
 A. Associational standing of the Unions to seek money damages on behalf of Union members ......................................... 213
 B. Statutory standing of the Unions to seek relief on behalf of Legal Aid ......................................... 214
 C. Contractual standing of the Unions ......................................... 216
 D. "Disappointed bidder" standing of Legal Aid ......................................... 216
 III. Statute of limitations, joinder, and injunctive relief......................................... 217
 A. Statute of limitations ......................................... 218
 B. Joinder ......................................... 219
 1. Necessary parties ......................................... 219
 2. Indispensable parties ......................................... 220
 C. Substantial performance ......................................... 221
 IV. Exhaustion of administrative remedies ......................................... 222
 V. Waiver......................................... 223
 A. Law of the case ......................................... 224
 B. Duress and estoppel ......................................... 225
 C. The Unions and their members ......................................... 226
 D. First Amendment rights ......................................... 226
 E. National Labor Relations Act rights ......................................... 228
 F. New York rights ......................................... 229
 VI. Section 1983 liability ......................................... 231
 A. Legislative immunity ......................................... 231
 B. Municipal liability ......................................... 231
 1. Budgetary authority......................................... 232
 2. Contract procurement authority ......................................... 233
 VII. First Amendment claim ......................................... 234
 VIII. National Labor Relations Act claim ......................................... 234
 A. Pre–strike interaction......................................... 235
 B. Post–strike interaction ......................................... 236

CONCLUSION .................................................. 240

## INTRODUCTION

These related actions, both brought pursuant to 42 U.S.C. § 1983, present a number of federal and pendent state claims arising from a dispute between the City of New York and the entities with whom it contracts to provide legal services to indigent criminal defendants. In the first action, the Legal Aid Society ("Legal Aid") alleges that the City of New York, the Criminal Justice Coordinator of the City of New York, Mayor Rudolph W. Giuliani, former Criminal Justice Coordinator Katherine N. Lapp, and current Criminal Justice Coordinator Steven M. Fishner (collectively, the "City" or the "municipal defendants") violated Legal Aid's state and federal rights by interfering with a labor dispute between Legal Aid and the unions that represent its employees and by subsequently transferring business from Legal Aid to Queens Law Associates, P.C., Brooklyn Defender Services, New York County Defender Services, Inc., Bronx Defenders, Battiste, Aranowsky & Suchow, Appellate Advocates, and the Center for Appellate Litigation (collectively, the "provider defendants").

Specifically, Legal Aid contends that the City interfered with federal labor rights protected by the National Labor Relations Act ("NLRA"), retaliated against Legal Aid and its agents for the exercise of their free speech rights pursuant to the First Amendment of the U.S. Constitution, breached the City's contract with Legal Aid, and violated state and local laws governing the distribution of municipal contracts. In the second action, premised on the same nucleus of facts, plaintiffs Association of Legal Aid Attorneys, Local 2325, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, AFL—CIO/CLC and 1199 National Health and Human Services Employees Union, AFL—CIO/CLC (collectively, the "Unions"), who respectively represent the staff attorneys and support staff employed by Legal Aid, allege that the actions of the City, the Mayor, and Ms. Lapp violated the Unions' and their members' rights pursuant to the NLRA and the First Amendment.

Following limited discovery proceedings, the City and the provider defendants have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(b), or in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56(c), dismissing the complaints in both actions. For the reasons set forth below, defendants' motions are granted in part and denied in part. In addition, certain portions of the motions are denied with leave to renew upon the completion of discovery in order that those motions may be decided with the benefit of a more complete record in both actions.

### BACKGROUND

On September 30, 1994, the collective bargaining agreement between Legal Aid and the Association of Legal Aid Attorneys (the "union") expired. According to the complaints, Mayor Giuliani proposed to displace Legal Aid and to cancel its City-wide contract as the principal provider of legal services to the indigent if it negotiated a wage increase with the union, even if Legal Aid were able to fund the increase without recourse to additional funding

from the City. Because of the risk of displacement, Legal Aid decided not to respond to the union's demand for a wage increase. As a result, the unionized attorneys walked off the job at 12:01 a.m. on Saturday, October 1, 1994. Despite the fact that Legal Aid attorneys had struck seven times previously in Legal Aid's 30–year contractual relationship with the City, on this occasion the Mayor directed the termination of all Legal Aid contracts with the City on the grounds that Legal Aid had violated its ethical obligation to provide legal representation to indigent persons since its attorneys were on strike.

Three days after the strike began, the Mayor stated that he would consider entering into a new contract with Legal Aid, but only if the contract included a no-strike provision, permitted the City to contract with other legal service providers, and barred attorneys who did not return to work from any further representation paid for by the City. The strike ended four days later, and the union signed a four-year contract with Legal Aid that included a no-strike provision. In late October, the Mayor gave formal 90–days' notice of the termination of the City's contract with Legal Aid. On February 3, 1995, the City and Legal Aid entered into a "Modification Agreement" that altered the terms of the previous contract by expressly granting the City the authority to "arrange for other entities to provide services to replace the services hereunder."

In October 1995, the City issued a Request for Proposals (the "First RFP") soliciting bids for municipal contracts for the provision of legal services to indigent persons. Addendum Four to this First RFP explicitly excluded Legal Aid from participation by providing that any "proposal submitted by the Legal Aid Society would be deemed not responsive." In June 1996, the City awarded contracts pursuant to the First RFP to defendants Queens Law Associates, P.C., Brooklyn Defender Services, and Appellate Advocates. In November 1996, the City issued a Second

RFP, that also specifically excluded Legal Aid and that resulted in the award of contracts in May 1997 to defendants New York County Defender Services, Inc.; Bronx Defenders; Battiste, Aronowsky & Suchow; and the Center for Appellate Litigation. In March 1999, the City issued a Third RFP, that did not exclude Legal Aid and that resulted in the award of contracts to defendants Appellate Advocates and the Center for Appellate Litigation. (These defendants will be referred to collectively as the First, Second, and Third RFP providers, respectively.) Simultaneously, the City transferred cases from Legal Aid to these provider defendants and reduced Legal Aid's budget accordingly.

On July 9, 1996, Legal Aid filed action No. 96 Civ. 5141, alleging that the City had interfered with the collective bargaining process in violation of the NLRA, retaliated in order to punish protected speech in violation of the First Amendment, breached the City's contract with Legal Aid, and violated a number of state and local laws governing the solicitation and award of municipal contracts. Four months later, the Unions filed action No. 96 Civ. 8137, alleging identical federal claims but no state claims. Both complaints sought monetary damages and equitable remedies, including injunctive relief against all municipal contracts awarded pursuant to the RFPs. In an opinion dated October 8, 1997, this Court denied the Unions'. request for a preliminary injunction against the Second RFP and any similar attempts to divert business from Legal Aid. *See Association of Legal Aid Attorneys v. City of New York,* No. 96 Civ. 8137, 1997 WL 620831, at *1 (S.D.N.Y. Oct. 8, 1997).

At approximately the same time Legal Aid commenced action No. 96 Civ. 5141 in this Court, it filed what it styled as an Article 78 "petition and complaint" in New York State Supreme Court challenging the First RFP on both state and federal grounds. One week after the action was commenced, New York State Supreme Court Justice David Saxe denied the petition and dismissed the proceedings on the grounds that the claims were barred by the applicable statute of limitations and were without merit. Legal Aid immediately filed an amended pleading that was similarly dismissed. This Court therefore dismissed the action in No. 96 Civ. 5141 on the grounds of res judicata and collateral estoppel. *See Legal Aid Soc. v. City of New York,* No. 96 Civ. 5141, 1997 WL 394609, at *6 (S.D.N.Y. July 11, 1997). Shortly thereafter, however, the state court's dismissal was reversed in part by the Appellate Division, First Department. *See Legal Aid Soc. v. City of New York,* 242 A.D.2d 423, 424, 662 N.Y.S.2d 303, 304 (1st Dep't 1997). Accordingly, this Court granted Legal Aid's motion to reopen action No. 96 Civ. 5141. The state proceeding was subsequently removed to federal court as No. 97 Civ. 7566. *See Legal Aid Soc. v. City of New York,* No. 97 Civ. 7566, 1998 WL 689950, at *1 (S.D.N.Y. Sept. 30, 1998). Although related to the other federal actions, that action is not the subject of the present motions.

Following the completion of certain discovery proceedings, defendants now move for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(b), or in the alternative for summary judgment pursuant to Fed. R.Civ.P. ˙56(c), dismissing the complaints. For the reasons set forth below, defendants'

## DISCUSSION

### I. Applicable standard

#### A. Judgment on the pleadings ·

When presented with a motion to dismiss pursuant to Fed.R.Civ.P. 12(b), a court must assume that the allegations set forth in the complaint are true, and the motion may be granted " 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 234 (2d Cir.1999) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)), *cert. denied,* —— U.S. ——, 120

S.Ct. 799, 145 L.Ed.2d 673 (2000). In deciding such a motion, however, a court may rely only on the factual allegations set forth in the complaint itself and not on additional matters asserted in affidavits, exhibits, or other papers submitted in conjunction with the motion. *See Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000). Both sides to this dispute have submitted a plethora of affidavits and exhibits for consideration by this Court. If a court relies upon such additional matters, then the motion must be converted to one for summary judgment and accordingly must be assessed instead under the standards applicable to Fed.R.Civ.P. 56. *See id.* Because "[t]his conversion requirement is strictly enforced," *id.* at 83, this Court will treat defendants' motion as one for summary judgment unless specifically noted otherwise.

### B. Summary judgment

Summary judgment may be granted "only when the moving party demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quoting Fed.R.Civ.P. 56(c)); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen,* 64 F.3d at 79 (citation omitted) (quoting *Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir.1989)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with specific facts to show there is a factual question that must be resolved at trial. *See* Fed. R.Civ.P. 56(e); *see also Ali v. Bank of New York,* 934 F.Supp. 87, 91 (S.D.N.Y. 1996). A nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). In short, a nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

### II. Standing

The City first challenges the standing of the Unions as associations to seek monetary damages on behalf of their members, the statutory standing of the Unions to seek relief on the basis of harms suffered by Legal Aid, and the contractual standing of the Unions to seek relief flowing from the City's alleged breach of its contract with Legal Aid. In addition, the Third RFP providers challenge the standing of Legal Aid as a disappointed bidder to contest the award of contracts pursuant to the Third RFP.

### A. Associational standing to seek money damages on behalf of Union members

The U.S. Supreme Court has " 'recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 553–54, 116 S.Ct. 1529, 1534–35, 134 L.Ed.2d 758 (1996) (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). The third prong of this test, that neither the claim nor the relief require the participation of individual members, is a prudential limit on standing and is not necessary to the

Article III standing of a plaintiff. *See id.* at 558, 116 S.Ct. at 1537.

Pursuant to this third prong, however, "no federal court has allowed an association standing to seek monetary relief on behalf of its members." *United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Insurance Corp.*, 919 F.2d 1398, 1400 (9th Cir.1990) (citing *Telecommunications Research & Action Center v. Allnet Communication Servs., Inc.*, 806 F.2d 1093, 1095 (D.C.Cir.1986)); accord *Sanner v. Board of Trade*, 62 F.3d 918, 923 (7th Cir.1995). As the Supreme Court has explained, when an association seeks damages on behalf of its members:

> whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof. Thus, to obtain relief in damages, each member ... who claims injury as a result of respondents' practices must be a party to the suit, and [the association] has no standing to claim damages on his behalf.

*Warth v. Seldin*, 422 U.S. 490, 515–16, 95 S.Ct. 2197, 2213–14, 45 L.Ed.2d 343 (1975).

In response, the Unions contend that Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, authorizes them to seek monetary damages on behalf of their members. Section 301 generally grants unions standing to vindicate employee rights pursuant to a collective bargaining agreement negotiated by the union, even if the calculation of the damages suffered by individual employees is complicated. *See International Union v. Hoosier*, 383 U.S. 696, 699–700, 86 S.Ct. 1107, 1110, 16 L.Ed.2d 192 (1966). However, Section 301 applies only in cases where the claims asserted by a union arise out of a collective bargaining agreement. *See United Auto., Aerospace and Agricultural Implement Workers of America v. R.E. Dietz Co.*, 996 F.2d 592, 595 (2d Cir.1993). In the present case, the Unions are not seeking to vindicate rights pursuant to such an agreement but instead seek pursuant to 42 U.S.C. § 1983 to vindicate rights under to the NLRA and the First Amendment.

Indeed, to accept the Unions' argument would effectively eliminate the third prong of the associational standing test, contrary to the many cases that have applied this test to unions. *See, e.g., United Union of Roofers, Waterproofers, & Allied Trades No. 40*, 919 F.2d at 1400; *Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc.*, 540 F.2d 864, 865–66 (7th Cir.1976); *Communications Workers of America v. Nynex Corp.*, No. 93 Civ. 3322, 1997 WL 122869, at *3 (S.D.N.Y. Mar. 18, 1997); *Communications Workers of America v. Nynex Corp.*, No. 93 Civ. 5329, 1995 WL 590871, at *4 (S.D.N.Y. Oct. 5, 1995). *Allee v. Medrano*, 416 U.S. 802, 820 n. 13, 94 S.Ct. 2191, 2202 n. 13, 40 L.Ed.2d 566 (1974), cited by the Unions, is not to the contrary, since the union in that case sought only injunctive relief and not damages in vindication of its members' First Amendment rights, *see id.* at 804, 94 S.Ct. at 2195.

Accordingly, the Unions lack standing to seek monetary damages on behalf of their members.

**B. Statutory standing of the Unions to seek relief on behalf of Legal Aid**

The Second Circuit has recently explained the necessity of proximate causation to statutory standing pursuant to 42 U.S.C. § 1983:

> Civil actions brought under § 1983 are analogous to state common law tort actions, serving primarily the tort objective of compensation. A § 1983 action, like its state tort analogs, employs the principle of proximate causation. Although proximate causation in the § 1983 context is a question of federal law, in determining the meaning of the concept we look to those state tort analogs, because the Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983.

*Barnes v. Anderson,* 202 F.3d 150, 158–59 (2d Cir.1999) (collecting cases) (internal citations and quotation marks omitted).

In articulating the principle of proximate causation, the Second Circuit has instructed that:

> one notion traditionally included in the concept of proximate causation is the requirement that there be "some direct relation between the injury asserted and the injurious conduct alleged." For this reason, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover."

*Laborers Local 17 Health & Benefit Fund,* 191 F.3d at 235 (quoting *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268–69, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992)). "Thus, the other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are additional elements, not substitutes for alleging (and ultimately, showing) a direct injury." *Id.* at 235–36.

Moreover, three public policy factors guide the application of this "direct injury" test on a case-by-case basis:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Holmes,* 503 U.S. at 269–70, 112 S.Ct. at 1318–19 (citations omitted); *see Laborers Local 17 Health & Benefit Fund,* 191 F.3d at 236–37.

■ In the present case, the direct injury test plainly bars the Unions from seeking monetary damages for injuries that are purely derivative of any harms suffered by Legal Aid. First, it would be unnecessarily difficult to isolate the many factors in the collective bargaining process that might have influenced the flow of damages between Legal Aid and the Unions. Second, and for similar reasons, it would be nearly impossible to prevent duplicative recovery by Legal Aid and the Unions. Third, and most obviously, Legal Aid itself has already brought suit in action No. 96 Civ. 5141 to redress the same harms by seeking essentially the same damages in its own right. *See National Union of Hosp. & Health Care Employees v. Carey,* 557 F.2d 278, 281–82 (2d Cir.1977) ("In short, while union and employer, like the proverbial lion and lamb, may coexist in negotiated peace, we see nothing in this relationship which empowers the union to litigate with the State concerning the nature and extent of the employer's [federal] rights.").

■ However, the direct injury test need not bar the Unions from seeking injunctive relief in the present litigation. To begin with, the first two public policy factors under that test are crafted to address particular concerns with respect to the calculation and apportionment of damages, and by definition those concerns do not apply to a request for injunctive relief. Moreover, although Legal Aid seeks essentially the same injunctive relief, the relief sought by the Unions is not redundant, since the Unions seek such relief not as proxies asserting Legal Aid's federal rights but rather to remedy the indirect harms to their own rights pursuant to the First Amendment and the NLRA. *See Bantam Books, Inc. v. Sullivan,* 372 U.S.

58, 64 n. 6, 83 S.Ct. 631, 636 n. 6, 9 L.Ed.2d 584 (1963).

Indeed, federal courts have been particularly willing to recognize standing to seek injunctive relief on the basis of indirect harms where those harms implicate a plaintiff's free speech rights pursuant to the First Amendment. For example, the Supreme Court has recognized the standing of a publisher to bring a First Amendment challenge to a state commission's alleged threats to prosecute distributors of the publisher's works for dissemination of purportedly obscene materials. *See Bantam Books*, 372 U.S. at 64 n. 6, 83 S.Ct. at 636 n. 6; *see also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1153–54 (9th Cir.2000); *Alameda Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1411–12 (9th Cir.1996); *Penthouse Int'l Ltd. v. Putka*, 436 F.Supp. 1220, 1225 (N.D.Ohio 1977).

More recently, the Third Circuit has reiterated that:

> courts have been expansive in their view of a litigant's standing to bring legal action in situations in which free-speech rights are implicated. Cases addressing issues of standing in the free speech labor context ... have recognized that limitations on free speech rights can result in a 'chilling effect' on others' exercise of those rights, and have taken a broad view of standing based on this prospect.
>
> . . . .
>
> "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the Court to refrain from constitutionally protected speech or expression."

*Ruocchio v. United Transp. Union*, 181 F.3d 376, 385 (3d Cir.1999) (quoting *Nelson v. International Ass'n of Bridge, Structural & Ornamental Iron Workers*, 680 F.Supp. 16, 24 (D.D.C.1988) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973))), *cert. denied*, —— U.S. ——, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000). These same concerns apply with particular force in the present case.

Accordingly, the Unions lack standing to seek monetary damages for injuries that are purely derivative of harms suffered by Legal Aid. This includes transfers of funding from Legal Aid to the provider defendants, *see* Complaint, No. 96 Civ. 8137, ¶ E(3), punitive reductions in Legal Aid's funding, *see id.* ¶ E(6), as well as lost dues income resulting from these transfers and reductions, *see id.* ¶ E(7). However, the Unions do not lack standing to seek injunctive relief on the basis of the same underlying legal claims.

### C. Contractual standing

█ The City relies on the general rule that only a party in privity with a contract has standing to assert claims arising out of that contract, *see Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 110 (2d Cir.1998), to claim that the Unions lack standing to challenge any alleged breach of the City's contract with Legal Aid. However, the rights asserted and relief sought by the Unions arise out of the NLRA and the U.S. Constitution, and not out of a contract between the City and Legal Aid. Therefore, the City's argument must be rejected. *See UP State Federal Credit Union v. Walker*, 198 F.3d 372, 375–76 (2d Cir.1999) (per curiam).

### D. Disappointed bidder standing

In its complaint, Legal Aid contests the award of contracts pursuant to the Third RFP on the grounds that the award was arbitrary and capricious. *See* Second Amended Complaint, No. 96 Civ. 5141, ¶¶ 94–95. However, the Third RFP providers argue that Legal Aid was ineligible to compete for those contracts because the bid it submitted deviated materially and substantially from the specifications set forth in the Third RFP. In other words, because Legal Aid's bid allegedly was deficient, Legal Aid was ineligible to compete for the contracts issued pursuant to the

Third RFP and it therefore suffered no injury even if illegal favoritism did enter into the City's decision to award the contracts to the Third RFP providers.

■ Pursuant to New York law, noncompliance with a public bid specification "is considered material only when it would impair the interests of the contracting authority or place some of the bidders at a competitive disadvantage." *In re Varsity Transit, Inc. v. Board of Educ.*, 130 A.D.2d 581, 582, 515 N.Y.S.2d 520, 521 (2d Dep't), *appeal denied*, 70 N.Y.2d 605, 513 N.E.2d 1309, 519 N.Y.S.2d 1029 (1987). Allegations of noncompliance must be assessed in light of the "totality of the circumstances." *In re Superior Hydraulic, Inc. v. Town Bd.*, 88 A.D.2d 404, 409, 453 N.Y.S.2d 711, 715 (2d Dep't 1982). In the present litigation, it is undisputed that the City did not reject Legal Aid's bid as deficient. Accordingly, the City's decision to waive any alleged deviation as immaterial "must be upheld ... if supported by any rational basis." *In re Varsity Transit*, 130 A.D.2d at 582, 515 N.Y.S.2d at 521 (citing *In re C.K. Rehner, Inc.*, 106 A.D.2d 268, 483 N.Y.S.2d 1 (1st Dep't 1984)).

■ First, the provider defendants assert that Legal Aid's bid was deficient because it failed to specify a set fee to be paid by the City to Legal Aid for each appeal perfected under any contract awarded pursuant to the Third RFP. Here, however, M. Sue Wycoff, Attorney-in-Charge of the Criminal Appeals Bureau of Legal Aid, has testified that the bid was submitted in the mutual understanding with the City that Legal Aid would receive no compensation for cases that ultimately had to be reassigned to other providers because of conflicts of interest, which was the same manner of compensation as had operated pursuant to Legal Aid's earlier contracts with the City. *See* Supp.Aff. of M. Sue Wycoff, dated Aug. 2, 1999, at ¶ 21. In reply, the provider defendants argue that Legal Aid and the City could have shared no such understanding, since, according to these defendants, additional documentary evidence demonstrates that

Legal Aid did in fact include reassigned cases in determining its budget under prior contracts. *See* Supp.Aff. of Lynn W.L. Fahey, dated Dec. 3, 1999, at ¶¶ 1–6. At best, however, these competing contentions indicate the existence of genuine disputes as to material issues of fact whose resolution is inappropriate on the present motions for summary judgment.

Second, the provider defendants maintain that Legal Aid's bid was noncompliant because it failed to specify the costs Legal Aid expected to incur during its second year of operations under any contract awarded pursuant to the Third RFP. Wycoff, however, has testified that Legal Aid failed to specify these costs because Section IV.G. of the bid specifications indicated only one-year cost proposals were required. *See* Wycoff Supp.Aff. ¶ 27. In addition, Wycoff notes that the page for specifying such costs was missing from the packet of application materials Legal Aid received, and that Legal Aid offered to supply any missing information. *See id.; see also id.* Ex. F & n. 1. Finally, Wycoff points out that the City may have decided to waive any noncompliance on the assumption that Legal Aid intended its second-year costs to be identical to the first-year figures that Legal Aid did include in its bid. *See id.* ¶ 29; *see also In re Varsity Transit, Inc.*, 130 A.D.2d at 582, 515 N.Y.S.2d 520. In reply, the provider defendants argue that any such assumption would have been unrealistic given that the gradual phase-in of new staff would inevitably result in higher costs for the second year. Once again, such an assumption on the part of the City presents a disputed question of material fact.

Accordingly, summary judgment on the question of disappointed bidder standing should be denied without prejudice to the renewal of that question at a later date.

## III. Statute of limitations, joinder, and injunctive relief

The City and the provider defendants maintain that Legal Aid's state law claims

against the Second RFP providers are barred by the applicable statute of limitations, that the Unions have fatally failed to join any of the provider defendants as parties in timely fashion, and that the City's request for rescission of the Second RFP contracts and the Union's request for rescission of all RFP contracts should therefore be dismissed. The City also maintains that all requests for rescission of the RFP contracts and for injunctive relief against the performance of those contracts should be dismissed on grounds that the contracts have been substantially performed.

A. Statute of limitations

The Second RFP providers were first named as defendants in the Second Amended Complaint in action No. 96 Civ. 5141 on June 21, 1999. Moreover, the providers pleaded the statute of limitations as an affirmative defense in their answer. *See* Answer on Behalf of New York County Defender Services, Inc., et al., filed Aug. 9, 1999, at 17, ¶ 105. Therefore, these defendants have satisfied the requirement of Fed.R.Civ.P. 8(c) that an affirmative defense premised on a statute of limitations must be filed in the responsive pleadings in an action. *See Kulzer v. Pittsburgh–Corning Corp.*, 942 F.2d 122, 125 (2d Cir.1991); 2 James Wm. Moore, Moore's Federal Practice § 8.07[6] at 8–42 (Daniel R. Coquillette et al. eds., 2d ed.2000); *see also id.* § 8.07[4], at 8–40 to –41 (federal procedural law governs assertion of affirmative defense provided by state law) (citing *Santos v. District Council*, 619 F.2d 963, 967 (2d Cir.1980)).

■ Because "a federal court acts essentially as a state court in addressing pendent state law claims," the timeliness of Legal Aid's joinder of the Second RFP providers with respect to the state law claims is governed the statute of limitations applicable pursuant to state law. *Baker v. Coughlin*, 77 F.3d 12, 14 (2d Cir.1996). Pursuant to New York law, a challenge to agency action is normally governed by the four-month statute of limitations applicable to Article 78 proceedings.

*See* N.Y.C.P.L.R. § 217(1) (McKinney 1999); *accord Legal Aid Soc.*, 242 A.D.2d at 424, 662 N.Y.S.2d at 304. Therefore, joinder of the Second RFP providers was timely only as to state law claims accruing within the four months prior to June 21, 1999.

■ In the present case, Legal Aid challenges contracts awarded pursuant to the Second RFP on four grounds: first, that the City invited bids from entities and awarded contracts to entities outside the statutory categories of permissible legal services providers, *see* Second Amended Complaint, No. 96 Civ. 5141, ¶¶ 82–83; second, that the Second RFP was not adopted or ratified by the City Council as required by state law, *see id.* ¶¶ 84–86; third, that the Second RFP resulted in awards to multiple providers in violation of municipal law, *see id.* ¶¶ 89–91; and fourth, that the City improperly excluded Legal Aid from the bidding process even though it was objectively qualified to propose a bid, *see id.* ¶¶ 92–93. All of these claims accrued at the latest on or before July 1, 1997, when the City awarded contracts pursuant to the Second RFP. *See Legal Aid Soc.*, 242 A.D.2d at 426–27, 662 N.Y.S.2d at 306. Therefore, joinder of the Second RFP providers was timely with respect to none of these state law claims.

Legal Aid protests that this result is unfair because according to this logic Legal Aid would have had to bring suit within four months of November 1996, in order to challenge the issuance of the Second RFP in that month, even though the identities of the Second RFP providers were not known until the City awarded contracts pursuant to that RFP in July 1997. The short answer to this dilemma, however, is that Legal Aid could have brought suit within four months of November 1996 and then sought leave to amend the complaint in order to add the Second RFP providers as defendants once the contracts were actually awarded. *See Kulawy v. United States*, 917 F.2d 729, 736 (2d Cir.1990) ("[Plaintiff] would have been hard pressed,

of course, to name the purchasers in his original complaint, as the sales had not then occurred. He could, however, have sought leave to add the purchasers once the sales were completed.").

The Second RFP providers should be dismissed as defendants with respect to Legal Aid's state law claims challenging the Second RFP.

### B. Joinder

As noted above, the City seeks dismissal of Legal Aid's request for rescission of the Second RFP contracts based upon its state law claims as well as the Unions' request for rescission of any of the RFP contracts based upon its federal claims. Specifically, the City moves for such dismissal pursuant to Fed.R.Civ.P. 12(b)(7) and 19, which govern the dismissal of an action for failure to join indispensable parties.

■ Legal Aid and the Unions contend that this motion should be rejected because the City failed to raise it in timely fashion. However, this contention must fail:

> The provision governing timing of defensive responses makes it clear that "failure to join a party indispensable under Rule 19" is not a threshold defense that must be asserted at the pleading stage; instead, defendant may raise this issue through the end of trial. Thus, if defendant asserts that the absentee is indispensable—as opposed to merely necessary—the rule is liberal in allowing defendant to raise the issue relatively late in the proceedings.

4 Moore's Federal Practice § 19.02[4][b], at 19-26 (footnote omitted). The same also holds true under New York law. *See* N.Y.C.P.L.R. §§ 3211(a)(10), (e).

■ Legal Aid and the Unions further argue that the City's argument must be rejected—at least with respect to action No. 96 Civ. 5141—because Rule 19 permits dismissal only of entire actions and not of individual causes of action. However, this argument is incorrect as a matter of law, as courts regularly dismiss individual causes of action for failure to join an indis-

pensable party while allowing other causes of action to proceed. *See Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 520, 67 S.Ct. 828, 830, 91 L.Ed. 1067 (1947); *Fluent v. Salamanca Indian Lease Auth.,* 928 F.2d 542, 547 (2d Cir.1991); *Kawahara Enters., Inc. v. Mitsubishi Elec. Corp.,* No. 96 Civ. 9631, 1997 WL 589011, at *2–5, 7 (S.D.N.Y. Sept. 22, 1997).

Turning to the merits of Rule 19, the analysis required by that Rule is well settled:

> First, the Court must determine whether the absent party should be joined as a "necessary party" under Fed.R.Civ.P. 19(a). Second, if the court decides that the party is required but cannot be joined for practical or jurisdictional reasons, it must determine under Fed. R.Civ.P. 19(b) whether in "equity and good conscience" the action should be dismissed because the nonparty is "indispensable."

*Bayer Corp. v. Smithkline Beecham PLC,* No. 95 Civ. 5582, 1996 WL 34164, at *4 (S.D.N.Y. Jan. 29, 1996) (citations omitted); *see Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 116–18, 88 S.Ct. 733, 741–42, 19 L.Ed.2d 936 (1968); *Associated Dry Goods Corp. v. Towers Fin. Corp.,* 920 F.2d 1121, 1123 (2d Cir.1990); *Prescription Plan Serv. Corp. v. Franco,* 552 F.2d 493, 496–97 (2d Cir. 1977).

### 1. Necessary parties pursuant to Fed. R.Civ.P. 19(a)

Pursuant to Rule 19(a), a party is a "necessary party" if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multi-

ple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a); *see Patterson,* 390 U.S. at 107–08, 88 S.Ct. at 736–37; *Associated Dry Goods Corp.,* 920 F.2d at 1124; *Smith v. Kessner,* 183 F.R.D. 373, 375 (S.D.N.Y.1998).

■ In the present case, the Second RFP providers constitute "necessary parties" within the meaning of Rule 19(a)(2)(i). *See B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 730–32 (2d Cir.1983); *Freedom, N.Y., Inc. v. United States,* No. 86 Civ. 1363, 1986 WL 6163, at *1–2 (S.D.N.Y. May 27, 1986). In particular, the providers have interests in the contracts that may not be adequately protected by the municipal defendants in the present litigation. For example, it is the provider defendants and not the municipal defendants that have raised the argument on this motion that Legal Aid lacks standing to challenge the Third RFP because Legal Aid's bid was nonconforming. *See Freedom, N.Y.,* 1986 WL 6163, at *1. In addition, these providers are uniquely situated to provide evidence of their eligibility for consideration and the adequacy of their bids in order to demonstrate that the City's actions were in conformance with applicable state and local law. *See id.*

For the reasons stated above, however, the Second RFP providers may not be joined as parties to Legal Aid's state claims challenging the award of contracts to those providers. For similar reasons, neither the First RFP providers nor the Second RFP providers may be joined as parties to the Unions' federal claims.

■ First, in actions pursuant to 42 U.S.C. § 1983, courts look to the statute of limitations for personal injury actions in the state in which the alleged constitutional deprivation took place. *See Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). In New York, the applicable period is three years. *See* N.Y.C.P.L.R. § 214(5). Therefore, a three-year statute of limitations applies to the Unions' Section 1983 claims. *See Okure v. Owens,* 816 F.2d 45, 49 (2d Cir.1987), *aff'd,* 488 U.S. 235, 109 S.Ct. 573,

102 L.Ed.2d 594 (1989); *Harris v. City of New York,* 186 F.3d 243, 247–48 (2d Cir. 1999). Therefore, joinder of the provider defendants would be timely only with respect to those Section 1983 claims asserted by the Unions that accrued within the three years preceding the date they would be joined, if the Unions attempted to join them.

■ Second, under federal law, which determines when a claim accrues, a cause of action pursuant to Section 1983 accrues when the plaintiff "knows or has reason to know" of the alleged violations. *See Morse v. University of Vt.,* 973 F.2d 122, 125 (2d Cir.1992). Therefore, the Unions' claims with respect to the First RFP accrued in or before June 1996, when the First RFP contracts were awarded, and claims with respect to the Second RFP accrued in or before May 1997, when the Second RFP contracts were awarded. Therefore, joinder of the provider defendants would be timely with respect to none of these claims.

2. Indispensable parties pursuant to Fed. R.Civ.P. 19(b)

Because necessary parties cannot be joined to the challenged claims, this Court must consider whether dismissal of those claims is required because those parties are "indispensable" within the meaning of Rule 19(b). That rule sets forth four factors that enter into this determination:

[F]irst, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed.R.Civ.P. 19(b); *see Associated Dry Goods,* 920 F.2d at 1124; *Smith,* 183

F.R.D. at 375–76. As this Court has explained:

> An inquiry pursuant to Rule 19(b) is guided by the court's discretion and the facts of the particular case. The rule does not assign relative weight to any of the factors that are listed, but instead leaves it to the court to determine whether "in equity and good conscience" the case should proceed without the party in question.

*Smith,* 183 F.R.D. at 375–76 (internal citations omitted) (quoting Fed.R.Civ.P. 19(b)); *see ConnTech Dev. Co. v. University of Conn. Educ. Properties, Inc.,* 102 F.3d 677, 682 (2d Cir.1996); *Associated Dry Goods,* 920 F.2d at 1124.

In the present case, the potential for prejudice is obvious. " 'No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.' " *Kulawy v. United States,* 917 F.2d 729, 736 (2d Cir. 1990) (quoting *Crouse–Hinds Co. v. Inter-North, Inc.,* 634 F.2d 690, 701 (2d Cir. 1980)); *see Lomayaktewa v. Hathaway,* 520 F.2d 1324, 1325 (9th Cir.1975); *Kawahara Enters., Inc. v. Mitsubishi Elec. Corp.,* No. 96 Civ. 9631, 1997 WL 589011, at *5 (S.D.N.Y. Sept. 22, 1997) (collecting cases); *Freedom, N.Y., Inc.,* 1986 WL 6163, at *1–4.

■ However, Rule 19(b) does not mandate dismissal of an entire claim in cases where the potential for prejudice may be ameliorated simply by dismissing the request for injunctive relief while retaining any request for monetary damages. As the Second Circuit has explained:

> As an alternative to dismissal, a court should take a flexible approach when deciding what parties need to be present for a just resolution of the suit. The phrase "good conscience" implies a careful and constructive consideration of those parties that are necessary to the litigation. As a consequence, very few cases should be terminated due to the absence of nondiverse parties unless

there has been a reasoned determination that their nonjoinder makes just resolution of the action impossible.

*Jaser v. New York Property Ins. Underwriting Assoc.,* 815 F.2d 240, 242 (2d Cir. 1987); *see also* 4 Moore's Federal Practice § 19.05[3], at 19–94; *Jaser,* 815 F.2d at 243.

In this context, it is readily apparent that dismissal of the relevant claims for equitable relief will alleviate any perceived prejudice to the provider defendants, since monetary damages will come solely from the pockets of the City without affecting the validity or performance of the municipal contracts already awarded to the provider defendants. In addition, such a judgment will adequately compensate Legal Aid and the Unions, because if successful they will receive monetary relief in redress for past violations as well as injunctive relief against future RFPs. Finally, in the alternative, dismissal of the relevant claims would provide a less satisfactory resolution, since Legal Aid would be unable to pursue its challenge to the Second RFP and the Unions would be left with no remedy at all. *See generally Jaser,* 815 F.2d at 243.

■ Accordingly, Legal Aid's request for rescission of contracts awarded pursuant to the Second RFP and its request for injunctive relief against the performance of those contracts based upon its state law claims should be dismissed. Similarly, the Unions' request for rescission of contracts awarded pursuant to the First and Second RFPs and their request for injunctive relief against the performance of those contracts should be dismissed. At the same time, these dismissals leave intact the ability of Legal Aid and the Unions to seek monetary damages based upon those same legal claims.

## C. Substantial performance

As noted above, the City seeks dismissal of Legal Aid's and the Unions' request for rescission of the contracts awarded pursuant to the First and Second RFPs, on the

grounds that those contracts have been substantially performed and rescission at this late date would impose an undue hardship on the City and the provider defendants. However, the parties devote minimal space to briefing this question, and the relevant law is less than fully clear. Therefore, the City's claim should be rejected without prejudice to its renewal at a later date.

IV. Exhaustion of administrative remedies

 The City maintains that Legal Aid's state claims challenging the First and Second RFPs should be dismissed for failure to exhaust administrative remedies. Because exhaustion of remedies is an affirmative defense provided by state law, application of the defense in this litigation is governed by federal procedural law, *see Santos*, 619 F.2d at 967, and state substantive law, *see Baker*, 77 F.3d at 14.

 Specifically, Legal Aid asserts that the City forfeited this affirmative defense by failing to raise it in its original answer or motion to dismiss, since Fed. R.Civ.P. 8(c) generally requires that affirmative defenses be asserted in the responsive pleadings. However, a defendant's "failure to raise exhaustion of administrative remedies in response to [the] first few complaints [does] not constitute a waiver of that affirmative defense," provided that the defense is timely raised in response to a subsequent amended complaint. *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999); *see also Blonder– Tongue Labs. v. Univ. of Illinois Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453–54, 28 L.Ed.2d 788 (1971); *Harris v. Secretary, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 343 n. 2 (D.C.Cir.1997); Fed.R.Civ.P. 15(a). In the present case, the City timely raised the exhaustion defense in its answer to the Second Amended Complaint filed by Legal Aid on June 15, 1999. *See* Answer, No. 56 Civ. 5141, filed Aug. 6, 1999, at 17, ¶ 118. In addition, there is no prejudice to if the City is permitted to assert this defense.

 Pursuant to New York law, exhaustion of administrative remedies is generally required prior to the initiation of litigation in the interest of preventing premature judicial interference with administrative efforts to develop a coherent enforcement scheme as well as to develop a factual record in the particular case. *See Watergate II Apartments v. Buffalo Sewer Auth.*, 46 N.Y.2d 52, 57, 385 N.E.2d 560, 562, 412 N.Y.S.2d 821, 824 (1978). However, New York permits exceptions to this general rule "where an agency's action is challenged as either unconstitutional or wholly beyond its grant of power, or when resort to an administrative remedy would be futile[,] or when its pursuit would cause irreparable injury." *Id.* (citations omitted). The application of these exceptions is discretionary. *See Lehigh Portland Cement Co. v. New York State Dep't of Envtl. Conservation*, 87 N.Y.2d 136, 143, 638 N.Y.S.2d 388, 391 661 N.E.2d 961, 964 (1995). Still, exceptions will be granted "only if the attack does not require resolution of significant factual matters." Patrick J. Borchers & David L. Markell, New York State Administrative Procedure & Practice § 7.9, at 217 & n. 19 (1998) (collecting cases).

Within this context, the precise question presented by the City is whether Legal Aid should have exhausted its administrative remedies pursuant to former New York City R. & Regs. tit. 9, ch. 4, § 7–07, with respect to the following claims: first, that the City invited bids from providers other than a "private legal aid bureau or society," in violation of New York County Law § 722 (McKinney 1999), *see* Second Amended Complaint, No. 96 Civ. 5141, ¶¶ 82–83; second, that the RFPs were never approved by the "governing body," allegedly the City Council, in violation of New York County Law § 722, *see* Second Amended Complaint, ¶¶ 84–86; third, that the RFPs resulted in awards to multiple providers even though such a result was not "necessary" for the provision of adequate services within the meaning of New York City R. & Regs. tit. 9, ch. 4, § 5–

05(b)(1), *see* Second Amended Complaint ¶¶ 89–91; and fourth, that the City improperly excluded Legal Aid from the bidding process even though it was objectively qualified to propose a bid, *see* Second Amended Complaint ¶¶ 92–93.

 In this context, Legal Aid first argues that the exhaustion requirement should be excused by reason of futility, since the summary rejection received by Legal Aid in exhausting its claims with respect to the Third RFP indicates to it that any additional attempts to exhaust would have been futile. Pursuant to New York law, futility requires more than a showing that the plaintiff has "some reason to doubt whether . . . appeal would be successful." *Pfaff v. Columbia–Greene Community Coll.*, 99 A.D.2d 887, 887, 472 N.Y.S.2d 480, 481 (3d Dep't 1984). Where an agency has effectively predetermined the issue before it, however, New York courts will excuse the failure to exhaust. *See Lehigh Portland Cement Co.*, 87 N.Y.2d at 140–41, 661 N.E.2d at 963, 638 N.Y.S.2d at 390. In the present case, Legal Aid has presented no reason to believe that exhaustion of the first two claims would have been futile. With respect to the last two claims, the contextual evidence strongly suggests that the Criminal Justice Coordinator had predetermined that Legal Aid would be excluded from the bidding process and that awards would be made to entities other than Legal Aid, thereby resulting in multiple awards. Even so, because the third claim implicates factual questions as to whether multiple providers were "necessary," excusal would be inappropriate with respect to that claim. Therefore, only the fourth claim, pertaining to the categorical exclusion of Legal Aid, should be excused from the requirement of exhaustion of administrative remedies on the grounds that any attempt to exhaust those remedies would prove futile.

In addition, Legal Aid argues that the exhaustion requirement should be excused for the reason that all of the challenged actions were wholly beyond the administrative agency's grant of power. Here, however, New York courts distinguish between agency actions that exercise an unlawful power and those actions that simply misapply a lawful power to a given fact pattern. *See Watergate II Apartments*, 46 N.Y.2d at 57–58, 385 N.E.2d at 563–64, 412 N.Y.S.2d at 824–25; *Davidson v. Rochester Tel. Corp.*, 163 A.D.2d 800, 802–03, 558 N.Y.S.2d 1009, 1011 (3d Dep't), *appeal denied*, 76 N.Y.2d 714, 565 N.E.2d 1268, 564 N.Y.S.2d 717 (1990); *In re Annette Dozier v. New York City*, 130 A.D.2d 128, 134–35, 519 N.Y.S.2d 135, 141 (2d Dep't 1987); *see also* Borchers & Markell, New York State Administrative Procedure & Practice § 7.9, at 217.

 In that regard, the first and third claims involved, at most, misapplications of a lawful power in determining whether a given bidder was a "private legal aid bureau or society" and whether awards to multiple providers were "necessary" for the provision of adequate services. By contrast, the allegation that the RFPs were unlawful because they never received City Council approval strongly suggests that the agency's actions were wholly beyond its legitimate power. Moreover, unlike the first and third claims, this last claim entails a question of pure law, without reference to underlying factual determinations. Therefore, excusal as to this claim is appropriate.

Accordingly, summary judgment should be granted dismissing Legal Aid's state law challenges to the First and Second RFPs, except insofar as Legal Aid challenges the alleged lack of approval by the City Council and the alleged categorical exclusion of Legal Aid from the bidding process.

## V. Waiver

The City and the provider defendants also contend that Legal Aid waived any legal right it might have had to challenge the RFPs when it agreed to the following provision in the Modification Agreement:

C. Nothing contained herein shall confer on Contractor [*i.e.*, Legal Aid]

any right to have assigned to it any minimum or maximum number of cases or any specific case. It is understood that the City may arrange for other entities to provide services to replace the services hereunder in whole or in part. In such event the Contractor's budget shall be modified to reflect the new service level, consistent with notification provisions of this Agreement.

Second Amended Complaint, No. 96 Civ. 5141, Ex. L, at 8. Defendants further contend that Legal Aid and the Unions are estopped from challenging the legality of this provision because they have continued to operate and to accept benefits from the City pursuant to the Modification Agreement. In response, Legal Aid asserts that the waiver argument is barred by the law of the case and that the provision should be voided on the grounds of duress.

A. Law of the case

■ The doctrine of law of the case "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618–19, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318, *reh'g denied*, 462 U.S. 1146, 103 S.Ct. 3131, 77 L.Ed.2d 1381 (1983), *and decision supplemented*, 466 U.S. 144, 104 S.Ct. 1900, 80 L.Ed.2d 194 (1984); *see United States v. Yonkers Bd. of Educ.*, 856 F.2d 7, 11 (2d Cir.1988); *Brown v. State*, 250 A.D.2d 314, 320, 681 N.Y.S.2d 170, 174–75 (3d Dep't 1998). The doctrine applies to issues explicitly resolved by the earlier decision as well as to those resolved "by necessary implication." *Fogel v. Chestnutt*, 668 F.2d 100, 105, 108–09 (2d Cir.1981).

■ In this context, Legal Aid posits that the law of the case doctrine bars defendants from asserting the defenses of waiver and equitable estoppel because those defenses were already considered and rejected by the Appellate Division, First Department in *Legal Aid Soc. v. City of New York*, 242 A.D.2d 423, 424, 662 N.Y.S.2d 303, 304 (1st Dep't 1997). However, this position must be rejected for

three reasons. First, the law of the case doctrine applies only where an earlier issue was decided "in the same case." *Arizona*, 460 U.S. at 618–19, 103 S.Ct. at 1391; *see Yonkers Board of Educ.*, 856 F.2d at 11 (same); *Brown*, 250 A.D.2d at 320, 681 N.Y.S.2d at 174 ("The doctrine of the 'law of the case' applies to various stages of the same litigation."). Law of the case doctrine is therefore inapplicable, because the decision of the Appellate Division, First Department was rendered not in the same case but rather in separate although parallel state court litigation.

Second, even if law of the case doctrine were applicable, the Appellate Division, First Department did not reach the questions of waiver and equitable estoppel, either expressly or by necessary implication, in rendering its decision. The decision focuses on the application of the relevant statutes of limitations to the claims asserted by Legal Aid in the state court litigation. *See* 242 A.D.2d at 425–27, 662 N.Y.S.2d at 305–06. In addition, it was unnecessary for that court to decide the questions of waiver and estoppel to reach its holding, which it stated as follows:

The [New York State Supreme Court] elected to view Legal Aid's pleading entirely in the context of an Article 78 proceeding, and dismissed all the claims asserted as barred by the 4–month Statute of Limitations (CPLR 217[1]). In denying the petition in its entirety, the ... court nonetheless failed to address specifically the third cause of action [*i.e.*, the NLRA claim], and the possibility that that claim might be governed by a different Statute of Limitations. We find this to be error, and modify accordingly.

*Id.* at 424, 662 N.Y.S.2d at 304 (footnote omitted). Thus, the Appellate Division's discussion of Legal Aid's NLRA claim and the City's defense to it were directed toward deciding whether Legal Aid had stated a valid claim pursuant to 42 U.S.C. § 1983, which, as the Appellate Division correctly concluded, is governed by a

three-year and not a four-month statute of limitations. *See id.* at 425–26, 662 N.Y.S.2d at 305–06.

■ Moreover, New York courts have repeatedly held that where an earlier appellate ruling is silent on an issue, and resolution of the issue was not necessary to reach the result of the ruling, the law of the case doctrine is inapplicable. *See Castle v. Gaseteria Oil Corp.*, 263 A.D.2d 523, 523, 693 N.Y.S.2d 216, 217 (2d Dep't 1999); *Gilligan v. Reers*, 255 A.D.2d 486, 486, 680 N.Y.S.2d 621, 622 (2d Dep't 1998); *Mulder v. Donaldson, Lufkin & Jenrette*, 224 A.D.2d 125, 130–31, 648 N.Y.S.2d 535, 538 (1st Dep't 1996); *Dwyer v. Nicholson*, 193 A.D.2d 70, 76, 602 N.Y.S.2d 144, 148 (2d Dep't 1993); *Gasparre v. St. Joseph's Med. Ctr.*, 186 A.D.2d 453, 454, 588 N.Y.S.2d 561, 561–62 (1st Dep't 1992).

Accordingly, Legal Aid's argument based on the law of the case doctrine must be rejected.

## B. Duress and Estoppel

■ Next, Legal Aid argues that the Modification Agreement should be voided on the grounds that Legal Aid entered into the agreement only under duress from the City. As the New York Court of Appeals has explained, "[a] contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130, 272 N.E.2d 533, 535, 324 N.Y.S.2d 22, 25 (Fuld, C.J.) (citing *Allstate Med. Labs., Inc. v. Blaivas*, 20 N.Y.2d 654, 229 N.E.2d 50, 282 N.Y.S.2d 268 (1967)), *rearg. denied*, 29 N.Y.2d 749, 276 N.E.2d 238, 326 N.Y.S.2d 1027 (1971).

■ The mere existence of economic pressure does not constitute duress. *See Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 22 (2d Cir.1974) (citing *Nixon v. Leitman*, 32 Misc.2d 461, 466, 224 N.Y.S.2d 448, 452 (Sup.Ct.N.Y.Co.1962)); *Walbern Press, Inc. v. C.V. Communications, Inc.*, 212 A.D.2d 460, 461, 622 N.Y.S.2d 951, 952 (1st Dep't 1995). Legal

Aid entered into the Modification Agreement as a sophisticated entity that had bargained with the City on previous occasions and was represented by competent counsel.

■ Even if the City's actions in terminating Legal Aid's prior contract without notice constituted duress, however, a party who seeks to void a contract by reason of duress must act promptly to repudiate the contract. In other words, "[a] party who executes a contract under duress and then acquiesces for any considerable length of time, ratifies the contract." *Sheindlin v. Sheindlin*, 88 A.D.2d 930, 931, 450 N.Y.S.2d 881, 882 (2d Dep't 1982); *see DiRose v. PK Management Corp.*, 691 F.2d 628, 633–34 (2d Cir.1982); Restatement (Second) of Contracts §§ 380–81 (1981). Plaintiffs delayed for well over a year before bringing any legal challenge to the Modification Agreement, which was signed in February 1995. Specifically, Legal Aid failed to bring suit until July 1996, over seventeen months later, and the Unions failed to file their action until October 1996, twenty months following the signing of the agreement. In the meantime, moreover, Legal Aid and the Unions continued to render services and to accept millions of dollars in compensation pursuant to the agreement they now challenge.

These delays fall well within the ranges found sufficient to vitiate a claim of duress as a matter of law. *See DiRose*, 691 F.2d at 633–34 (eighteen months); *Boyle v. Burkich*, 245 A.D.2d 609, 610, 665 N.Y.S.2d 104, 105 (3d Dep't 1997) (nearly two years); *Reader v. Reader*, 236 A.D.2d 829, 829, 653 N.Y.S.2d 768, 768 (4th Dep't 1997) (fifteen and one half months); *Nicholas A. Cutaia, Inc. v. Buyer's Bazaar, Inc.*, 224 A.D.2d 952, 953, 637 N.Y.S.2d 857, 858 (4th Dep't 1996) (six months); *Benjamin Goldstein Prods., Ltd. v. Fish*, 198 A.D.2d 137, 138, 603 N.Y.S.2d 849, 851 (1st Dep't 1993) (over one year); *Kranitz v. Strober Org., Inc.*, 181 A.D.2d 441, 441, 580 N.Y.S.2d 350, 350 (1st Dep't 1992) (twelve months);

*Bank Leumi Trust Co. v. D'Evori Int'l, Inc.,* 163 A.D.2d 26, 30–31, 558 N.Y.S.2d 909, 914 (1st Dep't 1990) (over six months); *George Colon & Co. v. East 189th Street Bldg. & Constr. Co.,* 141 A.D. 441, 126 N.Y.S. 226, 227 (1st Dep't 1910) (nearly fifteen months).

Accordingly, Legal Aid's claim of duress must also be rejected. Therefore, this Court turns to the merits of the waiver argument.

### C. The Unions and their members

■ "[A] waiver 'is ordinarily an *intentional* relinquishment or abandonment of a known right or privilege.'" *Doe v. Marsh,* 105 F.3d 106, 111 (2d Cir.1997) (emphasis added) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). Moreover, the waiver of a fundamental constitutional right must be undertaken "voluntarily, knowingly, and intelligently." *Id.* However, the City and the provider defendants proffer no explanation why a waiver of rights on the part of Legal Aid in the context of the Modification Agreement should be deemed binding with respect to the rights of the Unions and of the Legal Aid employees. Defendants do cite to a number of cases in which unions were found to have waived rights on the behalf of their members in the context of negotiating a collective bargaining agreement. However, these cases are inapposite for the reason that waiver in the collective bargaining context is conditioned on the necessity that "the union fulfill[ ] its duty of fair representation." *Plumbers & Pipefitters Local Union No. 520 v. NLRB,* 955 F.2d 744, 751 (D.C.Cir.1992) (citing *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 705–07, 103 S.Ct. 1467, 1475–77, 75 L.Ed.2d 387 (1983)); *see also Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machines,* 167 F.3d 764, 767 (2d Cir.), *cert. denied,* — U.S. —, 120 S.Ct. 68, 145 L.Ed.2d 58 (1999).

Accordingly, defendants' waiver argument should be rejected with respect to the Unions' suit without prejudice to the renewal of that argument at a later date.

Therefore, this Court turns to waiver with respect to Legal Aid's rights.

### D. First Amendment rights

■ As noted, the City asserts that Legal Aid waived any First Amendment rights it may have had to challenge the RFPs on the grounds that the RFPs were issued in retaliation for speech on matters of public concern. To determine whether Legal Aid did in fact waive these rights, this Court does not rely on New York law, since "the question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law." *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966); *see Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1094 (3d Cir.1988); *Sambo's Restaurants, Inc. v. City of Ann Arbor,* 663 F.2d 686, 690 (6th Cir.1981).

The Supreme Court has repeatedly recognized that constitutional rights may be legitimately waived in certain instances. *See, e.g., Town of Newton v. Rumery,* 480 U.S. 386, 397–98, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987) (right to sue government); *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (right to counsel); *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 184–86, 92 S.Ct. 775, 782–83, 31 L.Ed.2d 124 (1972) (due process rights); *Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967) (first amendment rights). However, any such waiver must be made "voluntarily, knowingly, and intelligently." *Marsh,* 105 F.3d at 111; *see Lake James Community Volunteer Fire Dep't, Inc. v. Burke County,* 149 F.3d 277, 280 (4th Cir.1998), *cert. denied,* 525 U.S. 1106, 119 S.Ct. 874, 142 L.Ed.2d 775 (1999); *United States v. Local 1804–1,* 44 F.3d 1091, 1098 n. 4 (2d Cir.1995); *Leonard v. Clark,* 12 F.3d 885, 889–90 (9th Cir.1993); *Erie Telecommunications,* 853 F.2d at 1094; *Sambo's Restaurants,* 663 F.2d at 690.

Moreover, the waiver must be established by "clear and compelling" evidence. *See Curtis Publ'g,* 388 U.S. at 145, 87 S.Ct. at 1986; *see Leonard,* 12 F.3d at 889–90; *Erie Telecommunications,* 853 F.2d at 1094; *Sambo's Restaurants,* 663 F.2d at 690. Accordingly, "the waiver of or 'acquiescence in the loss of' any fundamental right can neither 'be presumed nor may it be lightly inferred.'" *Marsh,* 105 F.3d at 111 (quoting *United States v. Mapp,* 476 F.2d 67, 77 (2d Cir.1973)); *see Ohio Bell Tel. Co. v. Public Utils. Comm'n,* 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937); *Lake James Community Volunteer Fire Dep't, Inc.,* 149 F.3d at 280. In other words, "courts must 'indulge every reasonable presumption against waiver of fundamental constitutional rights.'" *Marsh,* 105 F.3d at 111 (quoting *Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023); *see Erie Telecommunications,* 853 F.2d at 1095; *Sambo's Restaurants,* 663 F.2d at 690.

In the present case, two considerations weigh against interpreting the Modification Agreement as a waiver of Legal Aid's First Amendment rights. First, the agreement neither explicitly mentions those rights nor explicitly releases the City from all claims arising out of the transfer of business to other legal services providers. In this respect, the circuit cases on which the City relies most heavily are inapposite. *See Lake James Community Volunteer Fire Dep't,* 149 F.3d at 279 (provision explicitly waived right to object to citizen petitions or to bring legal challenges); *Leonard,* 12 F.3d at 887 (provision explicitly waived right to bring constitutional challenge in court); *see also Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (absence of vested property interest does not waive applicable constitutional rights).

The Supreme Court has recognized that implied waivers of constitutional rights are disfavored, and "a waiver of constitutional rights in any context must, at the very least, be clear." *Fuentes v. Shevin,* 407 U.S. 67, 95–96, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972); *see also Erie Telecommunications,* 853 F.2d at 1095–96; *Ruzicka v. Conde Nast Publications, Inc.,* 733 F.Supp. 1289, 1296–98 (D.Minn.1990), *aff'd on other grounds,* 939 F.2d 578, 582 (8th Cir.1991). Because the Modification Agreement does not explicitly waive Legal Aid's free speech rights, there is no waiver of those rights here. *Compare D.H. Overmyer,* 405 U.S. at 187, 92 S.Ct. at 783, *with Fuentes,* 407 U.S. at 95–96, 92 S.Ct. at 2002.

In addition, Legal Aid's First Amendment right against government retaliation was not clearly established until after the signing of the agreement in February 1995. As both the Supreme Court and the Second Circuit have explained, "a waiver 'is ordinarily an intentional relinquishment or abandonment of a *known* right or privilege.'" *Marsh,* 105 F.3d at 111 (emphasis added) (quoting *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023). However, it was only in 1996 that the Supreme Court first held that the First Amendment protects government contractors against retaliation for the exercise of their right to comment on matters of public concern. *See Board of County Commissioners v. Umbehr,* 518 U.S. 668, 673, 116 S.Ct. 2342, 2346, 135 L.Ed.2d 843 (1996). Moreover, at the time *Umbehr* was decided, the circuit courts were divided on the question, and the Second Circuit apparently had not opined on the point. *See id.* (collecting circuit court cases); *Planned Parenthood of Dutchess–Ulster, Inc. v. Steinhaus,* 60 F.3d 122, 128 (2d Cir.1995) ("This Court has not yet decided whether the constitution protects government contractors from retaliation for their political views."); *see also Fox v. Doran,* 974 F.Supp. 276, 280–81 (S.D.N.Y. 1997) (defendants were entitled to qualified immunity on the grounds that this point was not clearly established prior to *Umbehr*), *aff'd mem.,* 152 F.3d 918, 1998 WL 385779 (2d Cir.1998). Accordingly, because the Supreme Court did not extend First Amendment protections to government contractors until after the Modification Agreement was signed, that agree-

ment cannot constitute a knowing waiver of those First Amendment protections. *Compare Sambo's Restaurants,* 663 F.2d at 692–93, *with Erie Telecommunications,* 853 F.2d at 1098–99.

Accordingly, Legal Aid did not waive its First Amendment rights by entering into the Modification Agreement.

### E. National Labor Relations Act rights

The City also contends that the Modification Agreement waived any federal statutory rights Legal Aid may have had to challenge the issuance of the RFPs as preempted by the National Labor Relations Act. Because this argument entails a claim that Legal Aid waived its own statutory rights, the "clear and unmistakable" standard does not apply and the agreement is instead interpreted according to ordinary principles of contract interpretation. *See Interstate Brands Corp.,* 167 F.3d at 767; *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998).

In this context, the proper reading of the Modification Agreement becomes clearer when compared to other contractual clauses found by the Second Circuit to constitute legitimate waivers of rights pursuant to the NLRA. In *Olivetti Office U.S.A., Inc. v. NLRB,* 926 F.2d 181 (2d Cir.1991), the Second Circuit considered whether a union had waived its "right to bargain over the decision to relocate and subcontract" by agreeing to the following clause:

> The company will not transfer work customarily performed by members of the bargaining unit to another Company facility, or contract or subcontract out such work, except on the basis of unavailability of trained personnel or necessary equipment, production requirements, or cost of manufacture or distribution. If such decision is based on the cost of manufacture or distribution, the Company will notify and discuss with the Union as soon as possible the reasons why it believes such action

to be necessary, so that the parties may explore alternatives to such transfer of work.

*Id.* at 186–87. Applying the "clear and unmistakable" standard, the court concluded that the first sentence of this clause gave the employer "unfettered discretion to transfer work because of a lack of trained personnel, lack of necessary equipment or production requirements, regardless of any possible statutory imposed duty to bargain." *Id.* at 188. At the same time, the court also found that the second sentence preserved the statutory duty to bargain in cases where the employer transferred work "because of the cost of manufacture or distribution." *Id.*

Similarly, in *NLRB v. United Techs. Corp.,* 884 F.2d 1569 (2d Cir.1989), the Second Circuit considered whether the union waived NLRA rights with respect to the discharge of employees by agreeing to a clause providing that the employer "has and will retain the sole right and responsibility to direct the operations of the company ... including the right to make and apply rules and regulations for production, discipline, efficiency, and safety." *Id.* at 1575. Once again applying the "clear and unmistakable" standard, the court concluded that the clause granted the employer "broad authority to make disciplinary rules and to impose discipline leading up to and including discharge for good cause." *Id.* Although the clause did not explicitly waive the union's and employees' rights with respect to discharge, the court nonetheless found that the clause constituted a valid waiver of such rights, since "[t]he right to discipline implicitly includes the right to discharge." *Id.* at 1575–76.

 The plain import of these decisions is that, even under the "clear and unmistakable" standard applicable to waivers of NLRA rights in collective bargaining agreements, a clause that by its terms grants one party the right to engage in a particular course of conduct will generally constitute a valid waiver of NLRA rights that are arguably inconsistent with that

conduct. In the present case, as noted earlier, any such waiver is governed not by the "clear and unmistakable" standard but rather by the standard principles of contract interpretation. Accordingly, because the Modification Agreement grants the City the right to reduce Legal Aid's caseload and to transfer that caseload to other entities, the agreement constitutes a legitimate waiver of any rights pursuant to the NLRA that Legal Aid might have asserted in challenge to the City's issuance of the RFPs.

 Legal Aid contends that this result is unwarranted because the Modification Agreement does not explicitly waive Legal Aid's NLRA rights. As explained above, however, the Second Circuit has not required explicitness as a precondition to a valid waiver. Moreover, the only alternative interpretation put forth by Legal Aid is that the Modification Agreement "did no more than acknowledge what had long been the case," to the extent that New York County Law § 722 already permitted the City to establish a Public Defender Office or to contract with bar associations for the provision of legal services to indigent persons. Mem. of Law in Opp., at 15. However, basic principles of contract interpretation militate against the adoption of an interpretation that would render any portion of the contract language a nullity. *See Galli v. Metz,* 973 F.2d 145, 149 (2d Cir.1992); *Namad v. Salomon Inc.,* 74 N.Y.2d 751, 753, 543 N.E.2d 722, 723, 545 N.Y.S.2d 79, 80 (1989); *754 Fifth Ave. Assocs., L.P. v. Neiman–Marcus Group, Inc.,* 230 A.D.2d 666, 668, 646 N.Y.S.2d 990, 992 (1st Dep't), *leave to appeal granted,* 234 A.D.2d 187, 652 N.Y.S.2d 501 (1st Dept' 1996), *and appeal dismissed,* 89 N.Y.2d 939, 677 N.E.2d 290, 654 N.Y.S.2d 718 (1997).

Finally, the City's reading of the Modification Agreement is confirmed by the contextual evidence surrounding the adoption of the agreement. In particular, Legal Aid does not dispute that its prior contract with the City was terminated following a labor dispute that culminated in a strike by Legal Aid employees. *See* Plaintiffs' Statement of Material Facts ¶ 27. Nor does Legal Aid contest that in negotiating the Modification Agreement, the City had initially sought a no-strike provision that ultimately was not included in the final agreement. *See id.* ¶¶ 38, 41. In this light, the only reasonable interpretation of the events leading up to the agreement is that when the City dropped its request for a no-strike provision, it sought to include the clause now in dispute as a means of guaranteeing its right to contract work out to other entities, as a safeguard intended to minimize the possible disruptions from future strikes. This interpretation loses none of its force even if one accepts Legal Aid's contention that the October 1994 strike resulted in no actual disruptions, since the mere potential for disruption supports this reading. As a result, it would be anomalous to conclude that the clause does not waive Legal Aid's NLRA rights with respect to interference with the collective bargaining process.

Accordingly, the Modification Agreement constitutes a valid waiver of Legal Aid's ability to challenge the RFPs based upon any rights it might have pursuant to the NLRA. To this extent, summary judgment should be granted dismissing Legal Aid's NLRA claim.

## F. New York rights

Finally, the City contends that the Modification Agreement waived Legal Aid's right to challenge the RFPs based on legal claims grounded in New York law. These claims include Legal Aid's claims that the RFPs were issued in violation of state and local law, that the subsequent contracts were awarded in violation of state and local law, and that these actions by the City further breached Legal Aid's contract with the City. In other words, the precise question presented is not whether Legal Aid waived any vested property interest in its caseload but rather whether Legal Aid waived the right to challenge whether the manner in which such reductions were

made conformed with state and local law as well as with Legal Aid's contract with the City.

 Because the claims in question are state law claims, their waiver is governed by New York law. *See Baker*, 77 F.3d at 14. Pursuant to New York law, a party may generally waive any constitutional, statutory, and common law rights to which she is otherwise entitled. "Generally and excepting instances where there would be transgressions of public policy, all rights and privileges to which one is legally entitled, *Ex contractu* or *Ex debito justititae*, may be waived." *Hadden v. Consolidated Edison Co.*, 45 N.Y.2d 466, 469, 382 N.E.2d 1136, 1138, 410 N.Y.S.2d 274, 275 (1978).

At the same time, New York law subjects waivers to certain protections in order to ensure that such waivers are knowingly and voluntarily made. In the arbitration context, for example, the New York Court of Appeals has stated:

> It is settled that a party will not be compelled to arbitrate and, thereby, to surrender the right to resort to the courts, absent evidence which affirmative establishes that the parties expressly agreed to arbitrate their disputes. The agreement must be clear, explicit and unequivocal and must not depend upon implication or subtlety.

*In re Waldron v. Goddess*, 61 N.Y.2d 181, 183–84, 461 N.E.2d 273, 274, 473 N.Y.S.2d 136, 137 (1984); *accord Grovesteen v. New York State Public Employees Fed.*, 265 A.D.2d 784, 785, 697 N.Y.S.2d 392, 393 (3d Dep't 1999). By comparison, the Modification Agreement involves not simply the waiver of resort to a judicial forum, as would be the case with an arbitration clause, but the waiver of entire causes of action against the City and the provider defendants. Accordingly, the fact that any such waiver is not explicit in the agreement tends to weigh against the finding that Legal Aid knowingly and voluntarily agreed to such a waiver.

 In addition, any such waiver by Legal Aid would implicate serious questions of public rights. Pursuant to New York law, "[w]here a law seeks to protect the public as well as the individual, such protection cannot be waived by an individual. The public good is entitled to protection and consideration, and the individual must submit thereto." 57 N.Y.Jur.2d Legal and Constitutional Rights § 79 (1986) (footnotes omitted) (collecting cases). In the present context, moreover, the New York Court of Appeals has explained:

> The provisions of the statutes and ordinances of this State requiring competitive bidding in the letting of public contracts evince a strong public policy of fostering honest competition in order to obtain the best work or supplies at the lowest possible price. In addition, the obvious purpose of such statutes is to guard against favoritism, improvidence, extravagance, fraud and corruption. They are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest.

*Jered Contracting Corp. v. New York City Transit Auth.*, 22 N.Y.2d 187, 192–93, 239 N.E.2d 197, 200, 292 N.Y.S.2d 98, 102–03 (1968) (citation omitted); *see In re Acme Bus Corp. v. Board of Educ.*, 91 N.Y.2d 51, 54–55, 666 N.Y.S.2d 996, 998, 689 N.E.2d 890, 892 (1997); *Le Cesse Bros. Contracting, Inc. v. Town Bd.*, 62 A.D.2d 28, 34–35, 403 N.Y.S.2d 950, 954 (4th Dep't 1978), *aff'd*, 46 N.Y.2d 960, 388 N.E.2d 737, 415 N.Y.S.2d 413 (1979).

 In this case, waiver of the sort alleged by the City would directly undermine the purposes of the competitive bidding statutes and regulations. For example, such a waiver would potentially leave no party with standing to challenge either the exclusion of Legal Aid from the bidding process in the First and Second RFPs or the decision not to award a contract to Legal Aid pursuant to the Third RFP. In other words, there would be no

party with standing to vindicate the public interest.

In sum, New York law not only disfavors implied waivers of entire causes of action but also disfavors express waivers of statutory rights that would undermine the public interest. Accordingly, the Modification Agreement does not constitute a valid waiver of Legal Aid's rights pursuant to New York law.

## VI. Section 1983 liability

The City also challenges the imposition of liability pursuant to 42 U.S.C. § 1983 on the grounds that the City is protected by legislative immunity and that plaintiffs have failed to establish a policy or custom that would justify the imposition of municipal liability.

### A. Legislative immunity

The City asserts that it is protected by legislative immunity from liability for damages pursuant to 42 U.S.C. § 1983. *See, e.g., Bogan v. Scott–Harris,* 523 U.S. 44, 54, 118 S.Ct. 966, 972, 140 L.Ed.2d 79 (1998). In response, Legal Aid and the Unions clarify that "the individual Defendants have been sued only in their *official* capacities." Mem. of Law in Opp. at 17 (emphasis in original).

■ Pursuant to Section 1983, municipal officers are protected by common law immunities, such as legislative immunity, only when sued in their personal capacities and not when sued in their official capacities. *See Umbehr,* 518 U.S. at 676 n.*, 116 S.Ct. at 2348 n.* ("[B]ecause only claims against the Board members in their official capacities are before us, and because immunity from suit under § 1983 extends to public servants only in their individual capacities, the legislative immunity claim is moot.") (citation omitted); *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985); *Goldberg v. Town of Rocky Hill,* 973 F.2d 70, 73 (2d Cir.1992). Rather, a suit against a municipal officer in her official capacity is deemed a suit against the municipality itself. *See Graham,* 473 U.S. at

166, 105 S.Ct. at 3105 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

Accordingly, the City's defense of legislative immunity must be rejected. The remaining question is therefore whether municipal liability may be imposed.

### B. Municipal liability

■ Pursuant to Section 1983, a municipality may not be held vicariously liable for the torts of its employees or agents, but may be held liable only for injuries inflicted pursuant to a municipal "policy or custom." *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). Consonant with these principles, even where no municipal policy was formally adopted, liability may nonetheless arise from "a course of action tailored to a particular situation" by a municipal decisionmaker, provided that "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (plurality opinion).

The Second Circuit has recently explained the application of these principles in considerable detail:

> Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved. It does not suffice for these purposes that the official has been granted discretion in the performance of his duties. Only those municipal officials who have final policymaking authority may by their ac-

tions subject the government to § 1983 liability.

Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. The relevant legal materials[ ] include state and local positive law, as well as custom or usage having the force of law. The matter of whether the official is a final policymaker under state law is to be resolved by the trial judge before the case is submitted to the jury.

[Moreover], the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the municipality's business. Thus, the court must ask whether the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action.

*Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir. 2000) (internal citations, alterations, and quotation marks omitted), *petition for cert. filed,* 68 U.S.L.W. 3725 (U.S. May 11, 2000) (No. 99–1798); *see McMillian v. Monroe County,* 520 U.S. 781, 785–86, 117 S.Ct. 1734, 1737, 138 L.Ed.2d 1 (1997); *Jett v. Dallas Independent Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989); *St. Louis v. Praprotnik,* 485 U.S. 112, 123–27, 108 S.Ct. 915, 924–26, 99 L.Ed.2d 107 (1988) (plurality opinion); *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299. Finally, the burden rests on the plaintiff in a Section 1983 suit to establish that "the conduct of a given official represents official policy." *Jeffes,* 208 F.3d at 57–58.

1. Budgetary authority

In the present case, the City argues that no liability may be imposed pursuant to Section 1983 because the wrongdoing asserted by plaintiffs was allegedly committed by municipal actors who lacked final policymaking authority with respect to municipal budget policy. In other words, according to the City, plaintiffs have alleged

no wrongdoing by the City Council, which alone possesses final policymaking authority with respect to municipal budget policy, and therefore the City may not be held liable for the alleged torts of other municipal actors who lack such authority.

In this context, the New York City Charter confirms that the City Council possesses final decisionmaking authority with respect to the municipal contract budget. Specifically, the Charter provides that "[t]he council may alter any category in the contract budget submitted by the mayor, or change any terms and conditions of it." N.Y.City Charter, Ch. 6, § 104(f). In response, Legal Aid and the Unions point out that the City Charter grants the Mayor authority to impound funds previously allocated by the City Council for a particular purpose. *See id.* § 106(e). However, that same provision also requires the Mayor provide notice and justification of any such impoundment to the City Council. *See id.* More importantly, the City Charter explicitly grants the City Council authority to disapprove of any budgetary modifications proposed by the Mayor. *See id.* § 104(h).

█ Because any budgetary proposals submitted by the Mayor are ultimately subject to plenary review by the City Council, the City Council possesses final policymaking authority with respect to the municipal contract budget. "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *see Scala v. City of Winter Park,* 116 F.3d 1396, 1401–03 (11th Cir.1997); *Manor Healthcare Corp. v. Lomelo,* 929 F.2d 633, 637–38 (11th Cir.), *reh'g denied,* 942 F.2d 798 (11th Cir.1991); *Worsham v. City of Pasadena,* 881 F.2d 1336, 1340–41 & n. 9 (5th Cir.1989); *see also Fisher Scientific Co. v. City of New York,* 812 F.Supp. 22, 24 (S.D.N.Y.1993). The fact that the Mayor and the City Council may at times negoti-

ate compromises on matters of budgetary policy does not affect this conclusion, since there is no contention, and indeed no evidence, that the City Council has adopted a custom or policy of acquiescence to the Mayor's budgetary demands. *See Praprotnik,* 485 U.S. at 129–30, 108 S.Ct. at 927–28.

It is undisputed that Legal Aid and the Unions assert no wrongdoing on the part of the City Council. Accordingly, Section 1983 liability may not be imposed upon the City premised upon decisions made or actions taken with respect to the City's contract budget.

### 2. Contract procurement authority

Resolving the question of budgetary authority, however, fails to dispose of plaintiffs' Section 1983 claims in their entirety. As the Second Circuit emphasized, a "court must ask whether the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action." *Jeffes,* 208 F.3d at 57. In that case, the court went on to conclude that a county sheriff was a final policymaker with respect to the enforcement of a "code of silence" among correctional officers, even though he was not a final policymaker with respect to "routine classes of personnel actions," and even though his enforcement of the code of silence arguably implicated personnel decisions. *Id.* at 60–61.

In the present case, it is possible that the Mayor may be the final municipal policymaking authority with respect to the procurement of municipal contracts. For example, as Legal Aid points out, the New York Court of Appeals has stated:

> Under the ... New York City Charter (§ 8), the Mayor is authorized to "exercise all the powers vested in the city, except as otherwise provided by law." ... The city—and, thus, the Mayor on its behalf—is empowered to enter into contracts, to regulate the terms of employment and compensation of city employees and to determine the manner of

transacting the city's business and affairs.

*In re Bauch v. City of New York,* 21 N.Y.2d 599, 605, 237 N.E.2d 211, 213, 289 N.Y.S.2d 951, 953–54 (1968) (Fuld, C.J.) (citations omitted); *see Under 21 v. City of New York,* 65 N.Y.2d 344, 357, 482 N.E.2d 1, 5–6, 492 N.Y.S.2d 522, 526–27 (1985).

However, the possibility that the Mayor may possess final policymaking authority with respect to contract procurement is less than fully clear. First, to the extent that Legal Aid contends in its pendent state claims that New York County Law § 722 required approval of the RFPs by the City Council, that contention suggests that the Mayor lacked final authority with respect to the adoption of the RFPs. In addition, both state and local law appear to vest some policymaking authority in the New York City Policy Procurement Board. *See generally* N.Y.Gen.Mun.Law § 104–b (McKinney 1999); N.Y.City Charter, Ch. 13, § 311; N.Y.City R. & Regs. tit. 9. Therefore, to the extent the Mayor's decisions were constrained by the Board's policy against favoritism in the procurement of contracts, *see* N.Y.City R. & Regs. tit. 9, ch. 1, § 1–03, this constraint could potentially absolve the City of municipal liability, *see Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577 (2d Cir. 1989). Finally, to the extent that Legal Aid failed to exhaust its administrative remedies with respect to its challenge to the First and Second RFPs, this failure suggests that the challenged decisions with respect to those RFPs were not made by the final policymaking authority for the City.

■■■ The parties fail to discuss these issues in substantial detail, however. Accordingly, the City's motion for summary judgment should be denied with leave to renew on the question of municipal liability. At the same time, the burden of identifying a final municipal decisionmaker with respect to each of the challenged decisions and actions will ultimately rest with Legal

Aid and the Unions. *See Jeffes,* 208 F.3d at 57–58.

VII. First Amendment claim

■ Sixth, the City moves for summary judgment dismissing Legal Aid's and the Unions' First Amendment retaliation claim. The First Amendment generally prohibits a municipality from terminating its relationship with an independent contractor in retaliation for the contractor's exercise of its free speech rights. *See Umbehr,* 518 U.S. at 673–74, 116 S.Ct. at 2346. To plead a claim of illegal retaliation, therefore, an independent contractor must allege that (1) the speech at issue was protected by the First Amendment, and (2) the speech was a substantial or motivating factor in the decision to terminate the relationship. *See id.* at 675, 685, 116 S.Ct. at 2347, 2352 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977)); *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998).

■ With respect to the first element, the City argues that its legitimate proprietary interests outweighed plaintiffs' free speech rights, regardless of whether plaintiffs' speech was among the factors that motivated the City's actions. However, the City's analysis is off point. Once a plaintiff has identified the speech allegedly subject to retaliation, a court must first determine whether the speech at issue was protected by determining whether the speech related to matters "only of personal interest," as distinct from the expression of views of "a citizen upon matters of public concern." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). If the speech addressed matters of public concern, then First Amendment protection attaches and the court next balances the government's proprietary interests against the plaintiff's free speech interests. *See Umbehr,* 518 U.S. at 678–79, 684–86, 116 S.Ct. at 2348–49, 2352. "However, even if the ... balance is resolved in the [government's] favor, the [contractor] may still demonstrate liability by proving that the [government]

disciplined the [contractor] in retaliation for the speech, rather than out of fear of the disruption." *Lewis v. Cowen,* 165 F.3d 154, 163 (2d Cir.1999) (citing *Sheppard v. Beerman,* 94 F.3d 823, 827 (2d Cir.1996)). Here, plaintiffs have not yet specified the particular speech allegedly subject to retaliation.

■ With respect to the second element, the City attacks plaintiffs' proof of causation with the argument that certain of the speech voiced by plaintiffs during the labor dispute followed the termination of the Legal Aid contract chronologically and therefore could not have been a motivating factor in the decision to terminate the contract. Liberally construed, however, the complaints fairly allege that not simply the decision to terminate the contract but also the issuance of the RFPs and the exclusion of Legal Aid from the First and Second RFPs were motivated by retaliatory intent. It is undisputed that these events followed much of the speech in question, and plaintiffs should be given the opportunity to develop evidence through discovery on the factual question of motivation. *See MacDonald v. Safir,* 206 F.3d 183, 190–91 (2d Cir.2000).

Accordingly, the City's motion for summary judgment should be denied with leave to renew with respect to Legal Aid's and the Union's First Amendment claim.

VIII. National Labor Relations Act claim

The City next moves for summary judgment dismissing Legal Aid's and the Unions' claim pursuant to the National Labor Relations Act. In that claim, Legal Aid and the Unions allege that the City's actions intervening in the labor dispute and subsequently transferring business from Legal Aid to other legal services providers were in violation of the NLRA, and furthermore that any state laws that authorized such actions on the part of the City were preempted by the NLRA. In response, the City argues that any such conduct on its part was not preempted because it was undertaken in a proprietary capacity.

The Supreme Court " 'has articulated two distinct NLRA preemption principles.' " *Building & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 224, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993) (*"Boston Harbor"*) (quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748, 105 S.Ct. 2380, 2394, 85 L.Ed.2d 728 (1985)). The first principle, known as *"Garmon* preemption," prohibits state and local regulation of activities that the NLRA arguably protects or prohibits, as a means of preserving the " 'integrated scheme of regulation' " embodied in the NLRA and administered exclusively by the National Labor Relations Board. *Id.* at 224–25, 113 S.Ct. at 1194–95 (quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 781, 3 L.Ed.2d 775 (1959)). The second principle, known as *"Machinists* preemption," forbids state and local regulation of "areas that have been left 'to be controlled by the free play of economic forces,' " as a means of preserving Congress' " 'intentional balance' " of bargaining power between management and labor. *Id.* at 225–26, 113 S.Ct. at 1195 (quoting *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 147, 96 S.Ct. 2548, 2556, 49 L.Ed.2d 396 (1976)).

At the same time, these principles do not require the preemption of otherwise lawful activity undertaken by a state or municipality acting in a proprietary capacity, since such activity implicates the government's role as a purchaser and market participant rather than as a regulator. *See Boston Harbor*, 507 U.S. at 229, 232, 113 S.Ct. at 1197, 1199. In *Boston Harbor*, for example, a federal court had ordered the Massachusetts Water Resources Authority, an independent state agency, to undertake a ten-year, $6.1 billion cleanup of the Boston Harbor in compliance with federal environmental statutes. *Id.* at 220–21, 113 S.Ct. at 1192. In order to assure the stability of labor relations throughout the course of the project, the Authority authorized its project manager to enter into a collective bargaining agree-

ment with the Building and Construction Trades Council. *See id.* at 221, 113 S.Ct. at 1193. Among other provisions, the agreement required that all employees on the project become union members within seven days of their employment, whether employed by the general contractor or any subcontractor; in addition, the bid specification required that all bidding subcontractors submit to the terms of the agreement. *See id.* at 221–22, 113 S.Ct. at 1193. Reasoning that the NLRA permits private actors to enter into comparable agreements, the Supreme Court found the proprietary action theory applicable and concluded that the bid specification was "not government regulation and ... is therefore subject to neither *Garmon* nor *Machinists* preemption." *Id.* at 232, 113 S.Ct. at 1199.

### A. Pre-strike interaction

The City first contends that the proprietary action theory protects its interaction with Legal Aid, its employees, and the Unions prior to the strike on October 1, 1994. As the City concedes, however, Legal Aid has proffered evidence that the City's intervention in the pre-strike labor dispute was directed toward non-proprietary purposes. Specifically, L. Robert Batterman, who served as an advisor to the management of Legal Aid during the September 1994 negotiations, has testified:

> I was informed by one or more of the individuals with whom I dealt in the City that the City would view with concern any wage increases extended to [union] members, *even if the Society self-funded them*, and that the City was attempting to establish a pattern of settlement that had no cost increases in the early years.

Aff. of L. Robert Batterman, dated Jan. 22, 1997, ¶ 3 (emphasis added).

In response, the City argues that Legal Aid has failed to corroborate Batterman's testimony with evidence, for example, of the identity of the City officials who allegedly made the statements in question.

The City further argues that Batterman's testimony is consistent with the proposition that the City was acting in proprietary fashion to obtain a favorable outcome to the labor dispute in order to strengthen its own bargaining position with other unionized municipal employees. *See, e.g.,* Decl. of Michael H. LeRoy, dated Sept. 29, 1999, ¶ 18. Batterman's testimony is troubling, however, since the allegation that the City opposed self-funded wage increases suggests that the City's actions may have had the effect of altering the terms of the collective bargaining agreement in a fashion unrelated to the asserted proprietary purposes of cost containment or strengthening of the City's bargaining position. *See Machinists,* 427 U.S. at 153, 96 S.Ct. at 2559. *Cf. Amalgamated Transit Union v. Byrne,* 568 F.2d 1025, 1029 (3d Cir.1977) (en banc). Moreover, given that discovery has not yet been completed in this litigation, it would be premature either to reject Batterman's testimony as uncorroborated or to accept it.

Accordingly, summary judgment should be denied with leave to renew with respect to the City's pre-strike interaction with Legal Aid. *See MacDonald,* 206 F.3d at 190–91.

B. Post-strike interaction

The City also posits that the proprietary action theory protects its interaction with Legal Aid, its employees, and the Unions after the October 1994 strike. Thus, this argument encompasses the adoption of the Modification Agreement, the subsequent issuance of the RFPs, the exclusion of Legal Aid from the First and Second RFPs, and the awarding of contracts to the provider defendants pursuant to the RFPs. In particular, the City maintains that these actions, which redistributed business from Legal Aid to the provider defendants, served the legitimate proprietary purpose of decreasing the City's exclusive reliance on Legal Aid as a safeguard against possible disruptions from future labor disputes between Legal Aid, its employees, and the Unions. *See generally* Decl. of Michael H. LeRoy, dated

Sept. 29, 1999. In other words, the distribution of business among multiple entities would minimize the impact to the City from any future dispute involving Legal Aid and would also bring a number of alternative legal services providers into existence so that the City could ask those entities to take reassigned cases in the event of a dispute.

In this sense, the City's response to the labor dispute between Legal Aid, its employees, and the Unions closely parallels an example of proprietary action discussed by the Supreme Court in *Boston Harbor:*

> In *Golden State [Transit Corp. v. Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) ], we applied the *Machinists* doctrine to hold that the city of Los Angeles was pre-empted from conditioning renewal of a taxicab operating license upon the settlement of a labor dispute. We reiterated the principle that a local government lacks the authority to introduce some standard of properly balanced bargaining power or to define what economic sanctions might be permitted negotiating parties in an ideal or balanced state of collective bargaining.
>
> . . . .
>
> In *Golden State* . . . , we held that the reason Los Angeles could not condition renewal of a taxicab franchise upon settlement of a labor dispute was that Machinists pre-emption precludes state and municipal regulation concerning conduct that Congress intended to be unregulated. We refused to permit the city's exercise of its regulatory power of license nonrenewal to restrict Golden State's right to use lawful economic weapons in its dispute with its union. As petitioners point out, a very different case would have been presented had the city of Los Angeles purchased taxi services from Golden State in order to transport city employees. In that situation, if the strike had produced serious interruptions in the services the city had purchased, the city would not necessari-

ly have been pre-empted from advising Golden State that it would hire another company if the labor dispute were not resolved and services resumed by a specific deadline.

507 U.S. at 226–27, 113 S.Ct. at 1195–96 (internal citations, alterations, and quotation marks omitted).

Although the Unions maintain that the 1994 labor dispute did not produce any actual interruptions in service, the threat of interruptions was imminent, as reflected in statements by Legal Aid and Union officials quoted in articles submitted by plaintiffs on this motion. *See, e.g.,* Decl. of Mark E. Coyne, dated Nov. 9, 1999, Ex. K. Accordingly, the imminent threat of disruptions to the provision of legal services renders the present scenario analogous to the hypothetical discussed in *Boston Harbor,* thereby suggesting strongly that the proprietary action defense protects the City's actions.

In response, the Unions argue that any asserted proprietary purposes were merely pretext for the actual subjective motivation of the municipal defendants, and that genuine factual issues persist with respect to such motivation. Specifically, the Unions protest that the City's actions were motivated by retaliatory animus against what was a lawful labor dispute as well as by a general desire to establish a municipal policy disfavoring strikes by attorneys. However, the subject motivation of a state actor is irrelevant to preemption analysis, which instead is guided by the objective effects of state action in relation to the federal scheme. As the Supreme Court explained in *Boston Harbor,* "we should not find [state action] preempted 'unless it conflicts with federal law or would frustrate the federal scheme, or unless [we] discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'" 507 U.S. at 223, 113 S.Ct. at 1194 (quoting *Metropolitan Life Ins. Co.,* 471 U.S. at 747–48, 105 S.Ct. at 2393).

To accept the Unions' contention would produce the anomalous result that the same actions, undertaken by different state actors with different subjective motivations, would yield different results under NLRA preemption analysis. However, "the whole basis of the Supreme Court's NLRA pre-emption doctrine has from the outset been the Court's perception that Congress wished the 'uniform application of its substantive rules and to avoid the diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.'" *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1338 (D.C.Cir.) (quoting *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971)), *reh'g denied,* 83 F.3d 439 (D.C.Cir.), *and reh'g en banc denied,* 83 F.3d 442 (D.C.Cir. 1996). Such a result would also run contrary to the law of the Second Circuit, which has rejected similar pretext arguments on motion for summary judgment simply by looking to the objective effects of the state or municipal actions taken. *See, e.g., Ace Auto Body & Towing, Ltd. v. City of New York,* 171 F.3d 765, 772–77 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 166, 145 L.Ed.2d 140 (1999).

Indeed, those circuit courts that have addressed this question have found subjective motivation irrelevant to the preemption issue. *See Chamber of Commerce,* 74 F.3d at 1336; *Hotel Employees & Restaurant Union v. Marriott Corp.,* No. C–89–2707, 1993 WL 341286, at *8 (N.D.Cal. Aug.23, 1993); *see also Cardinal Towing & Auto Repair, Inc. v. City of Bedford,* 180 F.3d 686, 692 (5th Cir.1999); *Colfax v. Illinois State Toll Hwy. Auth.,* 79 F.3d 631, 634–35 (7th Cir.1996). *But cf. Van–Go Transp. Co. v. New York City Bd. of Educ.,* 53 F.Supp.2d 278, 293 (E.D.N.Y. 1999).

Instead, courts have gauged the extent of preemption by the objective effects of the challenged state action, looking to see whether the action functions to promote a particular labor policy in general or else to serve legitimate proprietary needs within a more discrete setting. *Compare*

*Wisconsin Dep't of Indus., Labor & Human Relations v. Gould, Inc.,* 475 U.S. 282, 289, 106 S.Ct. 1057, 1062, 89 L.Ed.2d 223 (1986) (state law barring contracts with companies with record of NLRA violations was not proprietary); *Chamber of Commerce,* 74 F.3d at 1339 (executive order barring contracts with companies that permanently replaced striking workers was not proprietary); *Van–Go Transp. Co.,* 53 F.Supp.2d at 288 (policy of refusing to conditionally certify replacement workers applicable to all transport contracts was not proprietary); *and Air Transport Assoc. v. City & County of San Francisco,* 992 F.Supp. 1149, 1179 (N.D.Cal.1998) (city ordinance barring contracts with employers that did not offer domestic partner benefits was not proprietary); *with Cardinal Towing & Auto Repair,* 180 F.3d at 697 (city ordinance establishing competitive bidding scheme for municipal towing contract was proprietary); *Associated Gen. Contractors v. Metropolitan Water Dist.,* 159 F.3d 1178, 1183 (9th Cir.1998) (requirement that contractors adhere to collective bargaining agreement with particular benefits package was proprietary); *Colfax,* 79 F.3d 631, 634–35 (7th Cir.1996) (requirement that contractor adhere to area collective bargaining agreement was proprietary); *and Minnesota Chapter of Assoc. Builders & Contractors, Inc. v. County of St. Louis,* 825 F.Supp. 238, 243–44 (D.Minn.1993) (requirement that bidders for jail construction contract agree to labor agreement with benefits levels and no-strike clause was proprietary).

In the present case, the challenged City actions satisfy this standard. To begin with, the Unions have proffered no legal arguments that similar actions, if undertaken by a private actor, would violate the NLRA. *See Boston Harbor,* 507 U.S. at 231, 113 S.Ct. at 1198 ("To the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same."). Indeed, common sense alone suggests that potentially disruptive labor disputes would prompt private customers to pursue new or alternative providers of services. *See NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 308, 92 S.Ct. 1571, 1592, 32 L.Ed.2d 61 (1972) (Rehnquist, J., dissenting in part) ("From the viewpoint of [a] recipient of ... services, dissatisfaction with the labor relations environment may stimulate desire for a change of contractors.").

In addition, the argument that the City's actions serve the regulatory purpose of disfavoring strikes by attorneys is belied by the narrow context within which the City's actions were taken. There is no evidence that the City has attempted to impose such a general policy with respect to all attorneys practicing within the municipality, or even with respect to all entities with whom the City contracts for the provision of legal services. In fact, it is undisputed that the Modification Agreement itself does not contain a no-strike provision. *See* Plaintiffs' Statement of Disputed Material Facts, ¶ 41. Likewise, "[t]he premise on which the [*Boston Harbor* ] Court's ... analysis rested ... was that the ... governmental entity ... was not seeking to set general policy; it was just trying to operate as if it were an ordinary general contractor whose actions were 'specifically tailored to one particular job.'" *Chamber of Commerce,* 74 F.3d at 1336–37 (quoting *Boston Harbor,* 507 U.S. at 232, 113 S.Ct. at 1198). Even in cases in which a state or municipality's actions ultimately affected contractors working on more than one project, courts have upheld such actions against preemption challenges provided that the actions were tied to a proprietary purpose. *See Colfax,* 79 F.3d at 634 (upholding requirement that contractors abide by multi-project labor agreement); *Babler Bros., Inc. v. Roberts,* 995 F.2d 911, 916 (9th Cir.1993) (upholding statute requiring all non-unionized contractors with the state to pay time and a half for overtime work).

On this point, however, the Unions contend that the City's actions affect the en-

tire market for the provision of legal services to indigent criminal defendants, and that this fact, combined with the constitutional duty of the City to provide such services, suggests that the City's actions were taken in a uniquely governmental, and hence regulatory, capacity. In framing this argument, the Unions rely heavily on the Supreme Court's statement in *Boston Harbor* that "[w]hen the State acts as a regulator, it performs a role that is characteristically a governmental rather than a private role." 507 U.S. at 228, 113 S.Ct. at 1197. However, the phrase "governmental ... role" refers neither to the nature of the market in which the state participates, nor to the reasons for the state's participation, but rather to the nature of the relevant activities undertaken by the state within that market. In *Boston Harbor* itself, the nature of the market was environmental restoration, and the state's reason for participating in that market was compliance with a federal court order pursuant to federal statute. 507 U.S. at 220–21, 113 S.Ct. at 1192. Had either of these factors been relevant to the presence of a "governmental ... role," the reasoning of the *Boston Harbor* decision would have focused on those factors rather than on the nature of the state's activities within the context of the clean-up project.

In the antitrust context, the Supreme Court has indicated that the market for legal services on behalf of indigent criminal defendants is not so qualitatively different from other markets as to obviate the market analysis generally applicable pursuant to federal statute. *See Superior Court Trial Lawyers Ass'n*, 493 U.S. at 423, 110 S.Ct. at 775 ("It is, of course, true that the city purchases respondents' services because it has a constitutional duty to provide representation to indigent defendants. It is likewise true that the quality of representation may improve when rates are increased. Yet neither of these facts is an acceptable justification for an otherwise unlawful restraint of trade."). In the present case, the City has not attempted to regulate all attorneys practicing within the legal services market, and has not

attempted to exclude Legal Aid from that market altogether, but has only attempted to restructure its relationship with Legal Aid in an effort to minimize possible disruptions in the provision of legal services.

Moreover, the fact that the City's proprietary actions in this case may have incidental effects on labor in the legal services market does not, by itself, alter this outcome. The Supreme Court has "held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor." *Boston Harbor*, 507 U.S. at 227, 113 S.Ct. at 1196; *see Chamber of Commerce*, 83 F.3d 439, 440 ("Virtually any governmental action directed to the ... economy affects collective bargaining."); *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n*, 824 F.2d 672, 674–76 (8th Cir.1987) (state commission's disallowal of telephone company's rate increases was not preempted by virtue of indirect effects on collective bargaining); *Massachusetts Nurses Ass'n v. Dukakis*, 726 F.2d 41, 42–45 (1st Cir. 1984) (state statute restraining increases in hospital reimbursement was not preempted by virtue of indirect effects on collective bargaining); *Amalgamated Transit Union*, 568 F.2d at 1029 (governor's threat to withdraw contracts from transit company if it collectively bargained for open-ended cost of living increase provision was not barred by NLRA); *Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1202 (2d Cir.1977) (no NLRA preemption where there was no evidence that city's refusal to patronize nonunion printers had indirect coercive effect on nonunion employees to abandon their right not to join a union).

Nor is this analysis altered by the possibility that the City might have pursued its proprietary goals by more effective means or by more narrowly tailored means. "[P]reemption analysis does not insist upon a least restrictive means test." *Ace Auto Body & Towing*, 171 F.3d at 777. Accordingly, circuit courts applying the proprietary action theory have declined to

question the wisdom of the particular means selected by a state or municipality in order to achieve its proprietary purpose. *See Cardinal Towing & Auto Repair,* 180 F.3d at 695–96 (deferring to city's proprietary decision to replace broad scheme involving multiple towing contracts with more competitive scheme involving single towing contract); *Associated Gen. Contractors,* 159 F.3d at 1184 ("[Plaintiff] might not think that [the agency scheme] is the best way to address those concerns [of labor harmony and efficiency], but it is pellucid that the concerns are the typical ones held by any market participant who is interested in building out a project without incurring unnecessary transaction costs. That is merely proprietary action.").

Accordingly, summary judgment should be granted dismissing the Unions' NLRA claim insofar as that claim pertains to the adoption of the Modification Agreement and the subsequent redistribution of Legal Aid's business pursuant to the RFPs.

### CONCLUSION

For the reasons set forth above, defendants' motions should be granted in part and denied in part. With respect to Legal Aid's claims in action No. 96 Civ. 5141, summary judgment should be granted dismissing (a) the Second RFP providers as defendants to the state law claims; (b) the request for rescission of and injunctive relief against the Second RFP contracts based on the state law claims; (c) the state law claims that bids were invited from providers other than a private legal aid bureau or society, and that awards were made to multiple providers even though such a result was not necessary; (d) allegations of *Monell* liability premised on the exercise of municipal budgetary authority; and (e) the NLRA claim in its entirety.

With respect to the Unions' claims in action No. 96 Civ. 8137, summary judgment should be granted dismissing (a) the requests for damages on behalf of the Unions' members and for damages derivative of harms suffered by Legal Aid; (b) the request for rescission of and injunctive relief against the First and Second RFP

contracts; (c) allegations of *Monell* liability premised on the exercise of municipal budgetary authority; and (d) the NLRA claim with respect to the City's post-strike interactions.

In both actions, summary judgment should be denied with leave to renew, following the completion of discovery, with respect to the following points: (a) the standing of Legal Aid as a disappointed bidder to challenge the awards of contracts; (b) the request for rescission of the RFP contracts, in light of the substantial performance of the contracts; (c) waiver of the rights of the Unions and their members; (d) allegations of *Monell* liability premised on the exercise of municipal contract procurement authority; (e) the First Amendment retaliation claim; and (f) the NLRA claim with respect to the City's actions before and during the October 1994 strike.

Except as stated above, however, defendants' motion for summary judgment dismissing the complaints in both actions should be denied.